Butler et al., Demandantes y Apelantes, *v.* Sorongo et al., Demandados y Apelados.

Apelación procedente de la Corte de Distrito de Arecibo en pleito sobre nulidad de testamento.

No. 1901.—Resuelto en febrero 24 de 1920.

Parcialidad—Prejuicio—Nuevo Juicio.—Aunque el juez sentenciador tiene amplia discreción en el examen de testigos y en la manera de dirigir el juicio, si debido a un criterio erróneo sobre la cuestión en controversia el caso no ha sido imparcialmente resuelto por sus méritos porque en la conducción del juicio la corte apoyó hasta un extremo no justificado la causa de los demandados e indebidamente obstruyó y restringió la presentación y desarrollo del caso por parte del abogado de los demandantes, el caso debe ser devuelto para un nuevo juicio.

Los hechos están expresados en la opinión.

Abogados de los apelantes: *Sres. E. Campillo y M. Tous Soto.*

Abogado de los apelados: *Sr. S. Largé.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

En este caso los demandantes establecieron una acción para que se anulara un testamento, el cual según rezaba había sido otorgado en 3 de febrero de 1915 por doña Dominga Butler, mujer de sesenta y tres años de edad, y apelan de la sentencia dictada contra ellos.

La acción se estableció por dos fundamentos, que, en sustancia, son los siguientes:

El uno, que por mucho tiempo antes de la fecha que arriba se indica la testadora se encontraba en un estado completo de idiotismo y, como consecuencia, privada del uso de sus facultades mentales; y el otro, que el testamento fué hecho por el notario a virtud de los datos que le suministró el esposo de la testadora, el demandado Ignacio María Sorondo, siguiendo las instrucciones que de él recibió; que doña Dominga no tuvo intervención absoluta en dicho testamento; que los testigos que figuran en el referido testamento no oyeron de la testadora las disposiciones e instrucciones que ella debió haber dado al notario.

Hay siete señalamientos de error, la mayor parte de los cuales no carecen de mérito, y se refieren a cuestiones de prueba así como al interrogatorio de los testigos. Puesto que hemos resuelto ordenar la celebración de un nuevo juicio por otros fundamentos, no creemos necesario discutir estas cuestiones de menos importancia, las cuales, mediante un cuidadoso estudio de los principios generales envueltos, pueden ser tomadas previamente en consideración, evitándose así el incurrir otra vez en los mismos errores antes de que el caso vuelva a ser oido nuevamente.

Podemos sugerir, sin embargo, por vía de advertencia en este sentido que existe por parte de este tribunal cierta tendencia a no estar enteramente de acuerdo respecto al punto de hasta que extremo puede una parte impugnar sus propios testigos sin que se demuestre sorpresa en el juicio. Esta

cuestión no fué levantada en la corte inferior ni en los alegatos en la apelación y no es necesario, por tanto, que sea ahora resuelta. Pero aparte de esto, la mayoría de este tribunal está convencida de que en el presente caso se probó lo necesario independientemente de la prueba en cuestión para que los demandantes establecieran un caso *prima facie* lo suficientemente fuerte para que fuese indispensable que los demandados mismos quedaran obligados a llamar a todos los testigos del testamento, incluyendo a Laureano Hernández. En vista de las circunstancias los demandantes tal vez nada perderían con creer que tendrán amplia oportunidad, al repreguntar a este testigo para obtener aquellos informes que de él necesiten, así como para impugnar toda aquella parte de su declaración que sea incompatible con otras manifestaciones hechas anteriormente por dicho testigo. ·

Y esto sugiere otra idea, o sea el hecho de no haber declarado como testigo el propio demandado Sorondo. El es quien se beneficia principalmente con dicho testamento, siendo también el supuesto autor del mismo. El era el esposo de la testadora, atendió personalmente a sus necesidades durante toda su enfermedad y, según los testigos del demandante, era la única persona en el mundo a quien ella podía comunicar sus deseos, de poder hacerlo.

En la contestación no solo se niegan los hechos alegados en la demanda sino que se alega afirmativamente la validez del testamento, alegándose entre otras cosas que a la llegada del notario ''después de los saludos de rúbrica, la citada doña Dominga Butler, en su cabal juicio y en perfecto estado de sus facultades mentales, dió al notario, de palabra, las instrucciones necesarias para que redactara y escribiese su testamento abierto, pasando luego el notario al comedor de la casa para redactar y escribir, como escribió, el testamento de doña Dominga Butler, con toda tranquilidad, de acuerdo con las instrucciones de dicha señora y conforme a su voluntad.''

Estas y otras cosas que se alegan, no por información y

creencia sino como hechos positivos, han sido juradas por Sorondo, Suau, Federica y Julia Soler como de conocimiento personal de estos demandados, ninguno de los cuales, con excepción de Suau, declaró en el juicio, y la fuerza de la declaración de este último está más que desvirtuada por otras manifestaciones anteriores que se probó fueron hechas a presencia del abogado y los demandantes y de la testigo Amalia Butler.

Dentro de las circunstancias resulta muy significativo el silencio en el juicio de estos demandados que tan ingénuamente juran las alegaciones contenidas en la contestación y particularmente el del marido, el constante compañero que cuidaba a la esposa enferma y quien, según los términos del testamento, era su único universal heredero.

Otro curioso incidente fué el de las siguientes repreguntas hechas por el juez al testigo Campillo, abogado de los demandantes, relativos a su entrevista con Suau, albacea testamentario, con anterioridad a la redacción de la demanda.

"A preguntas del juez, declaró que no conocía a Bernardo Suau.

"Juez: ¿Cómo podía llamarlo a su casa?—R: A mi casa no, a la casa de Amalia Butler.

"Juez: Pero, ¿por qué motivo lo llamó a su casa, qué recado le mandó?—T: Con un familiar de él.

"Juez: ¿Bajo qué pretesto?—T: Que estaba el abogado Campillo y que deseaba hablar con él; que los hermanos de la difunta le encomendaron el asunto; que primero no lo supo, que este señor, Bernardo Suau, no era de la parte que el testigo defendía, que era parte contraria; sabía que era albacea.

"Preguntado: ¿Sabe que la ley impone al albacea la obligación de sostener la validez de un testamento?—Contesta: Creo que puede o no; que trajo a Bernardo Suau y le exigió esas confesiones, porque era el esposo de una de las herederas, o sea de Julia Soler, demandada en este caso; para ver si su esposo quería asociarse como demandante.

"Preguntado: ¿Conoce el abogado tan bien como yo la ley?— Contesta: Pero el artículo 876 dice que es un deber y facultad de los albaceas sostener siendo justo la validez, la del testamento.

"Juez: ¿Vd. sabía que el albacea no podía estar o ser de otra

manera?—T: Pero esa misma parte de la ley, porque si él consideraba que el testamento no era justo no tenía que presentarse como demandado; que el motivo principal en este caso fué el ver si podía incluir como demandante a su esposa y a su cuñada, que vivía en su casa, y personas a quienes no conocía y dije que me presentara a Bernardo Suau y dijo él: no tiene necesidad de hablar con ellas porque ellas no se asociarán; y a las preguntas que le hice fué que me manifestó él, que no quería servir de testigo y que no iba a un lado ni a otro, y suponía que no fuera justo el testamento, y que lo buscó para saber datos y para poder formular la demanda sobre hechos ciertos, porque muchas veces al abogado le hablaban del asunto sin tener suficientes datos para establecer la acción y tiene que buscarlos o solicitarlos y aprovechó la oportunidad en que fué a Lares y entonces habló con él.

"Juez: Era arriesgado: era su deber sostener la validez del testamento.—Abogado: Siempre que lo creyera que era justo; pero él manifestó que no quería ir a una parte o a otra.

"Juez: Aquí ha demostrado lo contrario él."

No conocemos ningún principio de ley por el cual un albacea nombrado en un testamento falso o fraudulento esté en la obligación de sostener a sabiendas la validez de dicho testamento. Puede concebirse que tal idea como la que parece haber tenido en la mente el juez de la corte inferior pudiera habérsele ocurrido a Suau y que su actitud general hacia la controversia, si no su declaración. ha podido estar influída por dicha idea. Por consiguiente, meramente se hace mención de la cuestión incidentalmente a fin de evitar que pueda entenderse de nuestro silencio acerca de esta cuestión que nuestro criterio pudiera coincidir con el del juez sentenciador.

En igual sentido podemos decir que estamos inclinados a convenir con el apelado en que no es indispensable en todos los casos que las instrucciones que un testador da a un notario respecto del contenido de un testamento que va a autorizarse hayan de dársele a presencia de los testigos que han de estar presentes en el momento preciso de su otorgamiento. La cuestión en este caso es si la supuesta testadora

en realidad de verdad dió o no tales instrucciones.  Y si ella no se encontraba privada de sus facultades mentales entonces o si siendo de sano juicio y estando capacitada, se encontraba enteramente imposibilitada de poder expresar sus pensamientos ya de palabra o por escrito, de aquí parece deducirse que ella no dió las instrucciones detalladas que el notario describe así como el albacea nombrado en el testamento.  En el presente caso la declaración del mismo notario indicaba que la testadora, de poder otorgar el testamento, estaba en condiciones de hacerlo mejor por la mañana temprano, y al llegar el mensajero en busca del notario la noche anterior al día en que fué otorgado el testamento, hubo cierta discusión acerca de si debería él ir aquella misma noche al campo para poder estar en la casa temprano a la mañana siguiente.  Se convino por último en que el notario saliera temprano al día siguiente a fin de llegar a su destino tan temprano como fuera posible.  Y teniendo esto en cuenta salió él a las seis de la mañana acompañado de Bernardo Suau y de su esposa.  Por consiguiente, el notario, según su propia versión de este episodio, tuvo amplio aviso de que podría ser muy discutida en cualquier momento por las partes interesadas con razonable probabilidad de éxito la capacidad de la testadora para manifestar sus pensamientos si no su capacidad mental a menos que el hecho de tal capacidad quedara terminantemente establecido al momento de otorgarse el testamento.

Tal vez sería la mejor práctica en todos los casos y ciertamente tratándose de un testador de cuyas condiciones físicas surge claramente el hecho de que su capacidad para dar instrucciones inteligibles así como su capacidad mental para otorgar un testamento podrían ser impugnadas y, por tanto, sujetas a una fuerte duda, la prudencia ordinaria y el sentido común impulsarían a un notario honrado, si no a llamar a un médico, por lo menos hacer que dicho testador exprese en presencia de los testigos de algún modo su propósito o deseo que no sea mediante una mera señal o palabra de asen-

timiento por insignificante o general que fuera dicho consentimiento en sus términos.

De lo dicho anteriormente no queremos, por supuesto, dar a entender que un precepto distinto de ley, como tal, sería de aplicación en las circunstancias indicadas. Para los fines de esta opinión puede admitirse que la validez de un testamento nunca queda viciada por el mero hecho de no haber sido dadas las instrucciones por el testador a presencia de los testigos. Pero de aquí no se deduce que cuando los testigos que suscriben el testamento no han recibido informe alguno acerca del verdadero propósito e intención del testador, con excepción únicamente de una señal de aprobación o una forma más o menos indeterminada de conformidad con los términos de un documento completo que ha sido leído en voz alta por el notario, semejante "testamento" no puede ser destruído por prueba que pudiera ser considerada ineficaz para anular un documento suscrito por testigos ante quienes el testador ha manifestado de algún modo definido, aun cuando superficialmente, la disposición que ha de darse a sus bienes, demostrando así un grado considerable de criterio propio y de capacidad mental y demostrando a la vez su capacidad para poder expresar sus pensamientos por medio de palabras.

Como dato curioso en relación con esto, de paso puede hacerse mención del siguiente incidente para explicar la actitud algo incompatible de la corte inferior hacia esta faz del caso. Aunque directamente no se hizo esfuerzo alguno para impugnar la credibilidad del notario como testigo se admitió prueba de su buena reputación por el fundamento de que esta cuestión estaba en discusión y se insiste algo en la opinión acerca de esta prueba como prueba que no fué contradicha. Por otra parte, después que el notario en el examen de repreguntas había admitido el hecho de haber hablado con los testigos del testamento con posterioridad a la muerte de la testadora y negado el haber tratado de obtener *affidavits* de estos testigos, y aun cuando ni el testigo ni el abogado

de la defensa habían sugerido la posibilidad de incriminarse, o solicitado la protección de la corte, el juez sentenciador prontamente impidió que se siguiera investigando en este sentido, haciendo las siguientes observaciones:

"Si quiere traer una causa criminal está equivocado el abogado. No sé para qué se traen hechos que no tienen que ver nada con el asunto ese. Le hace cargos al testigo de falsificación de pruebas, de soborno y falsedad. La corte tiene que protejer al testigo cuando no se le preguntan cuestiones pertinentes."

El examen de repreguntas de otros testigos de la defensa fué asimismo restringido indebidamente.

Otro punto que sería conveniente que los demandados aclararan, si es que pueden hacerlo, es el de por qué la testadora, que según ellos firmó un documento notarial en el año 1913 y que no consta que hubiera perdido el uso de su mano derecha, no podía, de estar capacitada mentalmente, suscribir el testamento dos años después.

En un alegato de más de cien páginas los apelantes pretenden demostrar que el juez sentenciador estuvo influído por pasión y prejuicio hasta tal punto que no pudo apreciar debidamente la prueba que le fué presentada.

Desde luego no existe nada en los autos que indique que el juez de distrito tuviera conocimiento de alguna actitud o conducta indebida. Pero sí creemos que la corte inferior, movida, tal vez, por un alto respeto hacia la santidad de un documento notarial y especialmente a la de un testamento, intervino demasiado en la conducción del caso, apoyó hasta un extremo que no estaba justificado la causa de los demandados e indebidamente obstruyó y restringió la presentación y desarrollo del caso por parte del abogado de los demandantes. Por consiguiente, los méritos del caso no fueron juzgados y resueltos debidamente y preferimos, por tanto, devolver las actuaciones para la celebración de un nuevo juicio en vez de resolver la controversia tal como se encuentra mediante sentencia definitiva de este tribunal.

Cualquier exposición que hicieramos de todas las circuns-

tancias que nos han obligado a llegar a esta conclusión, basada en los autos en conjunto más que en un número dado de los numerosos incidentes surgidos en los procedimientos, envolvería una cita tal de la voluminosa exposición del caso que omitimos toda referencia de detalles. Será bastante con decir que durante el largo período que ha transcurrido desde que el caso fué sometido, todos y cada uno de los miembros de esta corte han hecho un estudio cuidadoso y particular de toda la prueba y el asunto ha sido materia de mucha discusión así como de nuestra más cuidadosa consideración.

No debe entenderse que estamos dispuestos a adoptar un criterio restringido de la amplia discreción que tiene un juez sentenciador en el examen de testigos y de la manera de conducir y dirigir el juicio. Sus deberes y facultades, que son bien conocidos en cuanto a esto, deben ser asumidos sin temor y puestos vigorosamente en práctica en favor de la justicia sustancial del caso, pero estamos obligados a resolver que en el presente caso el debido miramiento de ese mismo interés exige que la sentencia apelada sea revocada y el caso devuelto para ulteriores procedimientos que no sean incompatibles con ésta opinión.

*Revocada la sentencia apelada y ordenada la celebración de nuevo juicio.*

Jueces concurrentes: Sres. Asociados Wolf y del Toro.

El Juez Presidente Sr. Hernández y Asociado Sr. Aldrey disintieron.

OPINIÓN DISIDENTE DEL JUEZ PRESIDENTE SEÑOR HERNÁNDEZ.

Entiendo que en el presente recurso no hay envuelta propiamente otra cuestión legal que la de error en la apreciación de las pruebas por la Corte de Distrito de Arecibo. Esas pruebas han sido contradictorias, pues mientras unas, las de la parte demandante tienden a demostrar la nulidad del testamento otorgado por Dominga Butler en 3 de febrero de 1915, por falta de capacidad de la testadora y de formalidades legales, otras, las de la parte demandada tienden a

demostrar que tenía dicha capacidad y se han llenado suficientemente las formalidades exigidas por la ley. El Juez de Arecibo dirimió el conflicto en sentido favorable a la validez del testamento declarando sin lugar la demanda por la sentencia apelada y no vemos que en la apreciación de las pruebas haya procedido con pasión, prejuicio, parcialidad o manifiesto error. A la parte actora incumbe tanto por derecho sustantivo como por derecho procesal justificar cumplidamente su acción y si hubo deficiencia en sus pruebas, para poder obtener una sentencia favorable tal circunstancia no abona la celebración de un nuevo juicio, habiendo expresado como expresó la testadora por medio de un documento público válido *prima facie* su última voluntad, cuya eficacia debe sostenerse a no haber en contrario una prueba convincente y concluyente que la destruya.

Estimo que procede la confirmación de la sentencia apelada y estoy autorizado para consignar que mi compañero, el Juez Asociado Sr. Aldrey, está conforme con los puntos de vista que dejo expuestos.